FILED

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**Tampa, Florida**

2015 OCT 27  AM 10: 33

PATRICK RYAN BRAY   |

    *Plaintiff,*   |    Case No 15-CV- 2532 T35 T8M

  |

v.   |

  |

BANK OF AMERICA CORP.   |    **JURY TRIAL DEMANDED**
    and   |
BANK OF AMERICA, N.A.   |

  |

    *Defendant.*   |

## COMPLAINT

Comes now, the Plaintiff Patrick Ryan Bray (*pro se*), brings this action for violations of the Sherman Act, Clayton Act, Florida's Antitrust Law, pursuant to Section 542.15 et seq., of the Florida Statutes, via violations of Section 106 of the Bank Holding Company Act § 1972. Plaintiff seeks injunctive relief, civil penalties, and punitive damages against Defendant, Bank of America Corporation, and its wholly owned subsidiary Bank of America, N.A. (BANA).

## SUMMARY OF COMPLAINT

At the heart of this complaint are the facts that BANA, through its market power in syndicated loans, imposed a requirement on a customer in the last hour of negotiations that required the customer to take an undesired product and/or service in order to receive the desired product, i.e., a syndicated loan ("Loan"). The desired product of BANA's customer was the renewal of the Loan. The undesired product and service that was forced onto the customer by BANA were broker/dealer services from BANA's affiliate, Merrill Lynch, and the requirement that all transactions by BANA's customer, involving marketable securities, be provided by Merrill Lynch.



As set forth herein, the syndicated loan process is a painstaking, complicated process that takes months to complete.  BANA took advantage of the loan process, leveraged its market power, and enforced a requirement upon the customer just four (4) days prior to approval of the renewing of the Loan.  The requirement by BANA to impose the condition on its customer to only utilize its affiliate, Merrill Lynch, for broker/dealer services and the processing of all securities transactions of the customer's subsidiary's general account created a violation of Section 106 of the Bank Holding Company Act § 1972.

This action by BANA caused anti-competitive and anti-trust violations that restrained trade and excluded competition from the tied product (marketable securities), that affected numerous parties, and most of all devastated the Plaintiff's business, which will be described in detail below.  As a result of this illegal act, only affiliates of BANA and subsidiaries of Bank of America Corporation were able to benefit from the market of this product and/or service, as all competition was explicitly excluded.

It is a known assumption that violations of Section 106 of the Bank Holding Company Act § 1972 (now codified as 12 U.S.C. § 1972) occur regularly by banks in the market place, however, it is extremely hard to prove as most instances occur implicitly or orally.  This complaint is the extremely rare instance of violations where a preponderance of evidence shows explicit or written violations.  BANA's explicit violations of 12 U.S.C. § 1972 not only caused anti-competitive practices but also anti-trust violations.

**INTRODUCTION**

1.     Financial Services is an integral part of the Florida economy. Florida's services industry, in general, comprises the largest portion of the Florida economy with Florida's finance, insurance, and real estate industries ranking second in totality of Florida's economy.

2

2.      Florida, in protecting its citizens and businesses from the anti-competitive practices of others, enacted Florida Statute Section 542.15 to prohibit anti-competitive activities from a competitor, whether or not the anti-competitive practice was a per-se violation. This is reflected in Florida's "Unlawful Relationships with Competitors" portion of the Statute, i.e., tying.

3.      The Sherman Act, passed in 1890 as 15 U.S.C. §§ 1-7, amended by the Clayton Act in 1914 (15 U.S.C. § 12-27), prohibits activities that restrict interstate commerce and competition in the marketplace.

4.      § 1 of the Sherman Act states that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." § 2 of the Act further prohibits monopolization or attempts at monopolizing on any aspect of interstate trade or commerce and makes the act a felony.

5.      The Bank Holding Company Act § 1972 section 106 (now codified as 12 U.S.C. § 1972) is specific as to what constitutes a violation of the Act:

> (1) A bank shall not in any manner extend credit, lease or sell property of any kind, or furnish any service, or fix or vary the consideration for any of the foregoing, on the condition or requirement—
>
> (A) that the customer shall obtain some additional credit, property, or service from such bank other than a loan, discount, deposit, or trust service;
>
> (B) that the customer shall obtain some additional credit, property, or service from a bank holding company of such bank, or from any other subsidiary of such bank holding company;
>
> (C) that the customer provide some additional credit, property, or service to such bank, other than those related to and usually provided in connection with a loan, discount, deposit, or trust service;
>
> (D) that the customer provide some additional credit, property, or service to a bank holding company of such bank, or to any other subsidiary of such bank holding company; or

(E) that the customer shall not obtain some other credit, property, or service from a competitor of such bank, a bank holding company of such bank, or any subsidiary of such bank holding company, other than a condition or requirement that such bank shall reasonably impose in a credit transaction to assure the soundness of the credit.

6.     Bank of America, N.A. (herein referred to as BANA) is the market leader in book running (acting as Arranger) for syndicated loans.  Through June of 2009 BANA controlled 34% of all book-running transactions, with JP Morgan Chase controlling 29%, and Wells Fargo Bank controlling 8%[1].  The above information was garnered from Bank of America's own publishings.

7.     In 2009, there were a limited number of companies capable of acting as lead arranger for a syndicated loan and providing credit to fund a syndicated loan of $75,000,000 or more as credit was still extremely hard to come by for corporations due to the financial crisis and the collapse of Lehman Brothers.   This was evidenced by the fact that through June of 2009, the aforementioned three institutions controlled 71% of all book running.

8.     Due to the financial crisis that began in late 2007, competition was further depleted in the syndicated loan market with the consolidation of other large banking and financial institutions that previously competed in this market, such as Bank of America's acquisition of Merrill Lynch and Countrywide Financial, J.P. Morgan's acquisition of Bear Stearns and Washington Mutual, and Wells Fargo's acquisition of Wachovia Bank.

9.     Bank of America states that they were historically the sole or lead bookrunner on 75% of all deals from 2004 through June of 2009.

10.    Bank of America defines "Competitor" in their 2009 10k filing with the Securities and Exchange Commission as follows:

---

[1] http://www.reseaucapital.com/docs/pres_2009___20.pdf

*Competition -*

*We operate in a highly competitive environment. Our competitors include banks, thrifts, credit unions, investment banking firms, investment advisory firms, brokerage firms, investment companies, insurance companies, mortgage banking companies, credit card issuers, mutual fund companies and e-commerce and other internet-based companies in addition to those competitors discussed more specifically below. We compete with some of these competitors globally and with others on a regional or product basis. Competition is based on a number of factors including, among others, customer service, quality and range of products and services offered, price, reputation, interest rates on loans and deposits, lending limits and customer convenience. Our ability to continue to compete effectively also depends in large part on our ability to attract new employees and retain and motivate our existing employees, while managing compensation and other costs. More specifically, our consumer banking business competes with banks, thrifts, credit unions, finance companies and other nonbank organizations offering financial services. Our commercial and large corporate lending businesses compete with local, regional and international banks and nonbank financial organizations. In the investment banking, wealth management, investment advisory and brokerage businesses, our nonbanking subsidiaries compete with U.S. and international commercial banking and investment banking firms, investment advisory firms, brokerage firms, investment companies, mutual funds, hedge funds, private equity funds, trust banks, multi-family offices, advice boutiques and other organizations offering similar services and other investment alternatives available to investors. Our mortgage banking business competes with banks, thrifts, mortgage brokers and other nonbank organizations offering mortgage banking and mortgage related services. Our card business competes in the United States and internationally with banks, consumer finance companies and retail stores with private label credit and debit cards. We also compete actively for funds. A primary source of funds for the Banks is deposits, and competition for deposits includes other deposit-taking organizations, such as banks, thrifts and credit unions, as well as money market mutual funds. Investment banks and other entities that became bank holding companies and financial holding companies as a result of the recent financial crisis are also competitors for deposits. In addition, we compete for funding in the domestic and international short-term and long-term debt securities capital markets. Over time, certain sectors of the financial services industry have become more concentrated, as institutions involved in a broad range of financial services have been acquired by or merged into other firms or have declared bankruptcy. This trend continued in 2008 and 2009 as the financial crisis caused additional mergers and asset acquisitions among industry participants. This trend toward consolidation has significantly increased the capital base and geographic reach of some of our competitors. This trend has also hastened the globalization of the securities markets. These developments could result in our remaining competitors gaining greater capital and other resources or having stronger local presences and longer operating histories outside the United States. Our ability to expand certain of our banking operations in additional U.S. states remains subject to various federal and state laws.*

## JURISDICTION AND VENUE

11.　　The venue is appropriate due to the diversity of citizenship between the Plaintiff, a resident of Florida, and the Defendant's Corporations both headquartered in Charlotte, North Carolina along with the Plaintiff's claim being over $75,000 in damages.

12.　　This Court has subject matter jurisdiction over this action under 15 U.S.C. §§ 4, 26, and 28 U.S.C. §§ 1331, 1337, because this case arises under federal statutes protecting trade and commerce against restraints and monopolies, seeking to prevent, restrain, and enjoin violations of federal antitrust laws. BANA is engaged in interstate commerce and in activities substantially affecting interstate commerce. BANA supplies its products and services throughout the United States and is engaged in a regular, continuous, and substantial flow of interstate commerce, and its distribution business has had a substantial effect upon interstate commerce.

13.　　This Court has jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claims that they form part of the same case or controversy.

14.　　This Court has personal jurisdiction over BANA, because it transacts business and is found in the Middle District of Florida.

15.　　Venue is proper in the Middle District of Florida, under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b)(d).

## DEFINITIONS/PARTIES/RELEVANT ENTITIES

16.　　Maritz Holdings Inc. (Maritz) – A St. Louis, Missouri headquartered business, in the business of providing incentive and rewards programs to companies.

17.　　American Express Incentive Solutions (AEIS) – A St. Louis, Missouri headquartered

6

business, in the business of issuing pre-paid gift cards to corporations and citizens of the United States (AEIS was a joint venture between Maritz and American Express with Maritz being the majority shareholder holding a 51% share and American Express holding a 49% share).

18.     InteliSpend Prepaid Solutions (InteliSpend) – In February of 2010, Maritz purchased American Express's minority shares of AEIS and, as a result, Maritz became the 100% owner of AEIS and the name was changed from AEIS to InteliSpend.

19.     General Public Account (GPA) – An account of the general public's money that was held for future redemptions of already purchased, but yet to be redeemed, gift card monies held and controlled by InteliSpend, the issuer of the gift cards.

20.     Patrick Ryan Bray (Bray) – A Florida resident and Independent Registered Investment Advisor, who managed the General Public Account for InteliSpend in bonds and bond mutual funds from February 2004 through October 2011, and competed for business with Bank of America Corporation through its subsidiaries.

21.     NewBridge Securities (NewBridge) – A Florida corporation headquartered in Fort Lauderdale, Florida that acted as Bray's broker/dealer to process the securities transactions he performed for all his clientele including AEIS (InteliSpend).  Bray was a self–employed contractor of NewBridge and was never an employee of them.

22.     OppenheimerFunds (Oppenheimer) – A New York headquartered corporation in the business of providing and managing mutual funds for the general public and utilized by Investment Advisors such as Bray.

23.     Bank of America Corporation (BAC) – A publicly traded holding company headquartered in Charlotte, North Carolina for many of its wholly owned subsidiaries such as Bank of America, N.A. and Merrill Lynch

24.     Bank of America, N.A. (BANA) – A national commercial bank, headquartered in Charlotte, North Carolina, with branches throughout the United States and a wholly owned subsidiary of BAC.

25.     Merrill Lynch – A wholly owned subsidiary of BAC, affiliate of BANA, headquartered in New York with a primary focus of acting as a broker/dealer.

26.     Maritz Syndicated Loan (Loan) – A long standing, syndicated loan, renewed approximately every two years that consisted of BANA (acting as the bookrunner, lead lender, and administrative agent), J.P. Morgan Chase Bank, N.A., Wells Fargo Bank, N.A., U.S. Bank, N.A., The Northern Trust Company, and First National Bank of St. Louis.

## GENERAL ALLEGATIONS AND FACTS

27.     All paragraphs 1-26 are hereby reincorporated and re-alleged as if more fully set forth herein.

28.     Dating back to at least 2003, Maritz had a syndicated Loan, amended and renewed approximately every two years, in which BANA acted as the bookrunner (arranger), lead lender, and administrative agent.

29.     Due to a one time tax distribution to the owner of Maritz (Steve Maritz), in the amount of $25.6 million by Maritz, along with a one time $24.5 million restructuring charge, both occurring in 2009, Maritz went into a covenant default of the syndicated Loan, which was recognized after the June 30, 2009 measurement (audit) date by the syndicate.  At the time of the covenant default, Maritz had zero borrowings against its credit line from the syndicate.  Attached, as **Exhibit A**, is a ten (10) page internal BANA document dated September 9, 2009 referenced as the "Commercial Credit Products/Syndicated Finance Deal Screen Memorandum." Bullet point two (2) on page one (1) describes the above.

30.     Maritz and BANA had been in conversations to renew the already in place syndicated Loan to get some covenant relief and in August of 2009 Maritz informed BANA of a potential acquisition opportunity of American Express's minority shares of AEIS and wanted the syndicate to allow for that possibility (*see Exhibit A, page 2, 2nd bullet point*).

31.     Throughout this same period of time of the syndicated loan, dating back to February of 2004, Bray had independently managed the GPA for AEIS, where he traded the monies in bond mutual funds, held in trust accounts, held directly at the mutual fund companies.

32.     The initial investment, of the GPA that AEIS had hired Bray to manage in 2004 was approximately $5,000,000.  By 2009 the GPA had grown to $45,000,000 and up to $70,000,000 by October of 2011.  During all times that the GPA monies were managed by Bray, they were spoken for dollars, with the sole purpose being for redemptions by the general public of their already purchased gift cards.  New sales, however, by AEIS (InteliSpend), always outpaced the daily spend down of the cards and therefore the GPA account was rarely, if ever, reduced.

33.     On September 15, 2009, BANA, in internal discussions, spoke of requiring the GPA monies that Bray managed independently, be collateralized, as a condition of renewing the syndicated Loan in the event Maritz did in fact purchase the minority shares of AEIS. Attached, as **Exhibit B**, is an internal BANA communication, discussing this requirement for collateralization.  In this communication BANA stated that they spoke with the other members of the Syndicate and stated the belief that the renewal (amendment) as it stood at this juncture, with the current, new conditions, would be approved.

34.     Requiring the perfecting of a collateral assignment on monies to perfect a loan is perfectly legal, and is done quite often by banking institutions to protect their loan in the event of a default by the simple process of garnering a collateral assignment from the institution where

9

the securities are held.  On this particular loan renewal, however, the requirement of BANA to use the spoken for monies of the General Public as collateral for the Maritz loan is unusual and suspect as these monies were not an asset of Maritz or InteliSpend, but more like a demand account held by InteliSpend in the name of the General Public.

35.     The amount of the credit line given to Maritz by the syndicated Loan, through its renewal in 2009, was $85 million.  The syndicate already had Maritz's campus as collateral for this credit line, which was located at 1375 North Highway Drive, Fenton, Missouri 63099.  BANA had filed for the "Deed of Trust" on this property on April 25, 2003.  On May 25, 2006 BANA had the property's appraised value listed at $57,760,000.  This deed of trust at the time of the Loan renewal in 2009 was still in place.  In 2009 BANA also had an additional $100,000,000 in collateral from cash and equivalents along with accounts receivable (*see page 9 of Exhibit A*). Using BANA's numbers the syndicated Loan renewal was fully collateralized at 186% without the collateralization of the $45,000,000 of the GPA account, attached, as **Exhibit C,** is the "Deed of Trust" referenced above.

36.     The imposition, by BANA, of the requirement for Maritz to put up the GPA account as collateral in the event it purchased the minority shares in AEIS was a violation of Money Transmitter License Laws.  AEIS transacted a large amount of business with the State of California.  Attached, as **Exhibit D**, is the State of California's Financial Code Section 2000-2003 referencing its Money Transmitter Laws showing the collateralization of the GPA as a clear violation.  In essence, if Maritz had utilized its syndicated Loan and borrowed $70,000,000 and defaulted, BANA would liquidate the GPA account to pay the debt, InteliSpend would become insolvent, and the General Public would have lost its ability to utilize the prepaid gift cards that they had already purchased.  An example of a circumstance akin to this would be when

Springbok Services Inc. (another prepaid card servicer like AEIS) misappropriated the General Publics funds and was forced into bankruptcy after redemptions outpaced its sales, thereby leaving the General Public with worthless, previously purchased, cards.

37.    BANA knew these assets in the GPA had a dollar-for-dollar liability against them in the name of the General Public, but still chose to make it a requirement for the syndicated Loan renewal in the event Maritz purchased the minority shares in AEIS, thereby in effect they collateralized the loan at 238% and put the General Public in jeopardy of losing its monies.

38.    On August 26, 2009 the syndicate granted Maritz a temporary waiver on its borrowing capabilities that expired on September 30, 2009. When the renewal was not completed by the September 30, 2009 deadline, BANA and the Syndicate granted an additional 15-day extension to Maritz (*see Exhibit A, page 2, 1st bullet point*).

39.    It was during this time period in paragraph 38 that BANA notified Maritz, that the GPA had to be used as collateralization as a condition of the loan being renewed. While this was still illegal due to money transmitter license laws, it was something that Maritz agreed to do out of necessity.

40.    It was not until October 22, 2009, seven (7) days after Maritz's second extension expired on October 15, 2009, that BANA imposed the additional requirement that the GPA monies be moved to BANA or its Affiliate. Maritz was left with no choice but to accept BANA's illegal requirement in order to remain viable. It is essential for a company of the size of Maritz to have an open line of credit to remain viable in the event of opportunities that may arise or in the case of market downturns to cover items such as delinquent accounts receivables. Maritz rarely, if ever, accessed the credit line from the syndicated Loan but nevertheless it was essential for their business model.

41.     On October 22, 2009, BANA had internal discussions, and decided that not only were they going to require the GPA to be collateralized, but that the GPA must be moved to BANA or one of its affiliates for monitoring.  Attached, as **Exhibit E**, is a BANA internal communication reflecting the topic being discussed.  Later, herein, Bray will show how BANA's reasoning above is false and that BANA's monitoring capabilities would be the same wherever the GPA was held.

42.     It is here at this juncture that BANA began its violations of the Sherman Act and Clayton Act, via violations of the Bank Holding Company Act § 1972, while also violating Florida's Antitrust Law Florida Statute, Section 542.15, et seq.

43.     On the evening of October 22, 2009, BANA, in a conversation with the CFO of Maritz (Rick Ramos), told Maritz that the GPA must be moved to BANA or one of its affiliates (Merrill Lynch) as a condition of the loan to be able to monitor the assets.  This implicit violation of 12 U.S.C. § 1972 was verified in an October 23, 2009 internal BANA communication.  Attached, as **Exhibit F**, is BANA's internal communication verifying this illegal requirement where BANA states "I told them an account an account at b of a **must** be opened to place the mutual funds in so I can track."

44.     Just four days after the implicit violation of 12 U.S.C. § 1972, on October 26, 2009, the syndicated loan was approved for renewal.  Attached, as **Exhibit G,** is BANA's internal communication announcing approval.

45.     12 U.S.C. § 1972 is explicit as to what constitutes a violation of the law.  A bank may not impose a requirement on an individual or corporation to accept an undesired product or service as a condition to receive the desired product, unless it is considered a traditional bank product or service.

46.     The Federal Reserve Board of Governors (FED) is clear as to what constitutes a traditional bank product and/or service.  Products such as ACH services, automatic payments services, collection services, checking accounts, savings accounts, money markets, certificates of deposits, etc. are considered traditional bank products.

47.     The FED is also clear as to what is considered a non-traditional banking product and/or service.  Examples of non-traditional products and services are listed as broker/dealer services, investment advisory services, mutual funds, and marketable securities.

48.     The Office of Currency and Comptroller, which governs National Banks states:

**PROHIBITED TYING ARRANGEMENTS**

**A bank may not condition the extension of credit on the customer purchasing securities using a broker-dealer affiliate.**

49.     BANA also has internal policies that outline what is considered traditional vs. non-traditional bank products and services for its employees to follow.  These internal policies clearly outline what constitutes a violation of the law.  Attached hereto as **Exhibit H** is BANA's own material clearly listing broker/dealer services and mutual funds as non-traditional bank products and services (*best read if the first page is placed above the second*).  Using BANA's own words from their own employee material they state:

*Non-Traditional Bank Products: Conversely, BANA* **cannot** *condition a loan/service on the customer using any Bank of America Merrill Lynch entity for any* **non-traditional** *product/services.  The following products/services are examples of products and services that are* **not** *considered traditional bank products for tying purposes:*

*BANA then goes on to list under Non-Traditional Investment Products/Services; Broker/Dealer Services, Investment Advisory Services, Mutual Funds, etc.*

Also attached as **Exhibit I** is BAC's internal Anti-Trust Guidelines that states in bullet point five (5) that "[n]o associate may engage in unfair methods of competition or unfair or deceptive acts or practices."

50.     On November 13, 2009 the Syndicate and Maritz finalized the loan in which BANA wrote into the actual loan agreement the requirement that Maritz transfer to BANA or one of its affiliates as a condition of the loan all marketable securities in bond mutual funds of the GPA upon 45 days of Maritz acquiring the remaining shares of American Express of AEIS. Attached as **Exhibit J**, is a copy of the "Third Amendment to Second Amended and Restated Credit Agreement and Waiver." On page five (5) of this agreement under Section 7.16 is the clear, explicit violation of 12 U.S.C. § 1972 stating:

> *"Within forty-five (45) days after the date AEIS becomes a Subsidiary, AEIS **shall** open, maintain and otherwise have all investment accounts that contain bond mutual funds at Bank of America (or its Affiliates)."*

51.     Executives from Maritz and AEIS voiced their concerns numerous times to BANA of their not being comfortable with moving the GPA monies to BANA or Merrill Lynch as a condition of the Loan and wanting to maintain Bray, as their Registered Representative, independently. They were told, by BANA, however, that the requirement was was a material aspect of completing the Loan. Attached hereto as **Exhibit K** is one such communication between Maritz and BANA in relation to this condition. After this electronic communication, a conference call was held in which Maritz was told by BANA that not moving the GPA would violate the "spirit of the agreement." Attached, as **Exhibit L,** is another communication where Maritz again expresses its concerns to BANA with BANA then communicating internally regarding the matter. Attached as **Exhibit M** is a communication from AEIS that was forwarded to Bray that Maritz sent to BANA showing AEIS's one last attempt to avoid being required to move the GPA to Merrill Lynch. This request, however, was denied by BANA along with all other previous attempts.

52.     The necessity of the renewal of the syndicated loan for Maritz was far more important to

14

it than where the monies of the GPA were required to be held, and due to the consistent threats by BANA to not approve the loan if Maritz did not move the GPA account, Maritz agreed.

53.     Due to Maritz being in a technical covenant default of the syndicated loan in 2009, along with the syndicate's unwillingness to grant any more temporary waivers, Maritz had no other option than to accept the requirements made by BANA to close the loan.

54.     BANA abused its market power in syndicated loans, abused its long standing relationship with Maritz, and took advantage of Maritz by waiting until after the loan exceeded the second temporary extension to make the demands and requirement of the illegal tie of the GPA.

55.     It would have been impossible for Maritz to acquire another syndicated loan after BANA made this illegal requirement for several reasons:

(A) The financial institutions involved in this particular syndicate comprised 71% of the syndicate transaction market, which left Maritz, if it chose to, a very limited amount of institutions to choose from for another bookrunner to step in and fulfill Maritz's needs.

(B) BANA waited until Maritz was in desperation, after already being in a covenant default, along with two previous temporary extensions expiring, before making the requirement of Maritz to accept BANA's demand of moving the GPA monies to BANA or risk Maritz's credit line being pulled.

(C) It had taken virtually four (4) months for Maritz and the syndicate to come to agreeable terms as to the conditions of the renewed loan. BANA never mentioned to Maritz the requirement of moving the GPA to BANA or its affiliate until literally four days before the approval was granted while all other terms had been agreed to. BANA knew it would be impossible for Maritz to go through the arduous process of finding another syndicate in time to perfect the Loan renewal, and slid in the requirement,

in the last hour, knowing Maritz had zero leverage to reject the requirement.

56.     BANA violated 12 U.S.C. § 1972 in its requirement actions.  In doing so BANA violated the Federal Anti-Trust Laws of the Sherman and Clayton Acts by excluding interstate commerce via competition.

57.     The revenues generated from the management of the GPA, through the requirement of BANA to move the account to Merrill Lynch, was greater for BAC than that generated from the Loan itself.

58.     While numerous parties were affected by the anti-competitive and anti-trust violations of BANA, four (4) stand out.  Those parties are Bray, NewBridge Securities, Oppenheimer Funds, and the State of Florida.

59.     Bray, a Florida resident, had a long-standing relationship with his client AEIS prior to BANA's imposing the requirement and was clearly the individual harmed the most by BANA's violations.  Bray worked as an Independent Registered Investment Advisor, and used NewBridge Securities as his broker/dealer.  Upon BANA's illegal requirement to move the GPA, AEIS approached Bray and notified him that he had no choice, if he wanted to continue managing the GPA account, other than to get hired by Merrill Lynch.  Neither AEIS, Maritz or Bray were happy about this requirement imposed by BANA, but Bray was left with no other fiscal option for his family as the AEIS relationship, and his management of the GPA, contributed to approximately 70% of his income.

60.     In 2009 Bray was earning several hundred thousand dollars a year managing the GPA for AEIS from which his broker/dealer NewBridge Securities, a Florida Corporation, received approximately 20% of the revenue.

61.     Bray, with full endorsement of AEIS, left NewBridge, due to the requirements imposed

16

on the GPA account, and was hired by Merrill Lynch, albeit Bray was forced to take a 50% reduction in revenue as a Merrill Lynch employee versus his career working as an Independent. This of course caused NewBridge, through no fault of their own, to lose the revenue created from this account and additional revenues from all other accounts of clients Bray managed.  BANA thus forced a negative, monetary financial impact onto NewBridge by their actions albeit not nearly as a much as the loss to Bray.

62.     Oppenheimer Funds, which was the largest holder of GPA funds in a trust, which were held directly at Oppenheimer, lost the ability to hold these monies.  Merrill Lynch does not allow any mutual funds to be held directly at a mutual fund company, as had been the case of the GPA money for the six years prior, Merrill Lynch instead requires that all mutual funds be held in a general "omnibus" account held at Merrill Lynch in which it requires mutual fund companies such as Oppenheimer Funds to pay a fee to Merrill Lynch for accounting.  In essence, Merrill Lynch requires mutual fund companies such as Oppenheimer to pay fees to it purely to account for its own mutual funds.  If a mutual fund company refuses to pay such fees to Merrill Lynch then Merrill Lynch takes the mutual fund company off of its preferred vendor list and forbids its advisors from selling the mutual funds to the advisor's clientele.  Thereby the actions of BANA created a negative financial impact to Oppenheimer Funds albeit not nearly as much as the loss to Bray.

63.     In February of 2011, InteliSpend (formally AEIS) was in the process of applying for (renewing) a transmitter license in the State of California.  It was uncovered by Bray, through the pre-application (renewal) process, that InteliSpend was violating money transmitter license laws by having the GPA collateralized, as it was General Public's money and not that of InteliSpend or Maritz.

64.    Bray voiced his opinion numerous times to BANA as to its violations of 12 U.S.C. §
1972 while Bray was employed by both Merrill Lynch and BANA (as a dual employee).
Attached hereto as **Exhibit N** is a communication from Bray to BANA in response to BANA's
request of Bray for referral credit (compensation) for BANA's requirement of the GPA being
moved to Merrill Lynch. This communication states Bray's concern about BANA's violation of
12 U.S.C. § 1972. Nothing was ever investigated by BANA as to these illegal activities or
Bray's allegations. Neither InteliSpend, Maritz, or Bray were in agreement with how Merrill
Lynch operated and handled the GPA from the day Bray was forced to join Merrill Lynch, which
was March 3, 2010 through Bray's resignation on October 28, 2011.

65.    Neither Bray, InteliSpend, or Maritz were ever satisfied with the way Merrill Lynch
handled the accounting of the GPA during Bray's eighteen (18) months of employment with
them. There was not one month in Bray's tenure with Merrill Lynch in which Merrill Lynch
applied the dividends of the GPA correctly or issued a statement reflecting the correct account
balance of the GPA. These errors infuriated InteliSpend to no end as Merrill Lynch's ineptness
caused InteliSpend to be consistently late every month in reporting up to Maritz.

66.    On or around the first of October of 2010, InteliSpend approached Bray and told him that
they were going to leave Merrill Lynch within a short time frame because they could no longer
tolerate the errors caused by Merrill Lynch on the GPA account. It was during this conversation
that InteliSpend stated that they wanted to maintain Bray as the Advisor of the GPA but only if
he was at another broker/dealer. Bray agreed to this as he also did not think highly of Merrill
Lynch and notified InteliSpend days later of several broker/dealers he was comfortable moving
to.

67.    Two weeks prior to Bray's resignation from Merrill Lynch, which was on October 28,

2011, InteliSpend and Maritz had a meeting to discuss their disgust about the abundance of errors Merrill Lynch had caused on the GPA and, at that time, it was mutually decided by Maritz/InteliSpend that if Bray were to resign from Merrill Lynch, Maritz/InteliSpend would move the GPA with him to his next broker/dealer. Attached, as **Exhibit O,** is an affidavit from Daniel Sanders, the Vice President of Finance and Comptroller of InteliSpend reflecting this position of InteliSpend.

68.     The morning of Bray's resignation, October 28, 2011, BANA notified officers of Maritz and implicitly told them that if Maritz moved the GPA with Bray BANA would immediately put the Loan in *default*. This is confirmed by an internal BANA communication on that morning. Attached as **Exhibit P** is the internal communications between Merrill Lynch and BANA regarding Bray's resignation from Merrill Lynch, in which BANA states it will put the Loan in default if the GPA assets moved with Bray. Attached as **Exhibit Q** is a BANA communication to Maritz discussing the movement of the assets, referencing the informing of Matt Glazer, the Treasurer for Maritz, in which BANA told him at 9:37 Central Standard Time that should Maritz move the GPA monies with Bray, BANA would put the Loan into immediate default even though Maritz had no outstanding borrowings on October 28, 2011 against the syndicate facility. Evidence and testimony will prove that not for BANA's threat to Maritz to put the syndicated Loan into default in the event Maritz authorized the moving of the GPA monies with Bray on the day of Bray's resignation the GPA most certainly would have been moved with Bray.

69.     **Exhibit P** also shows that upon Bray's resignation, the supervisors of Merrill Lynch were confident they would not have the ability to maintain the InteliSpend account due to the strong relationship between Bray and InteliSpend and stated as much which is why Merrill Lynch reached out and colluded once again with BANA to gain support (which resulted in the threat to

19

Maritz of putting the Loan in default) rather than reach out to InteliSpend directly.

70.     InteliSpend moved their 401k (approximately $12,000,000 in value) with Bray the day of his resignation from Merrill Lynch on October 28, 2011, as the 401k monies were not illegally tied to the Loan further evidencing Maritz/InteliSpend's intention on moving the GPA monies with Bray had it not been for BANA's illegal actions on the day Bray resigned.

71.     BANA, in the past has stated that one reason the GPA needed to be held at its Affiliate, Merrill Lynch, was for monitoring purposes, as BANA was the Administrative Agent and had a fiduciary responsibility to the syndicate.  This, however, is not a true statement, as BANA had no additional monitoring capabilities than any other lender would have due to a legally required firewall between itself and its affiliates, which was no different from that of any competitor.

72.     BANA's monitoring capabilities in requiring the GPA to move to its affiliate were limited to three (3) things; a monthly statement, calling the client (Maritz or InteliSpend), or calling the advisor (Bray), the exact same capabilities as if the GPA were held anywhere else.  In fact, to prove BANA had zero additional monitoring capabilities, attached, as **Exhibit R**, is a communication dated June 4, 2010, some three (3) months after the collateralization of the GPA through Merrill Lynch, in which BANA reached out to Bray stating it had yet to receive any account information regarding the GPA from Merrill Lynch.  If monitoring were truly the key reason to require the GPA to move to Merrill Lynch it would not have taken three (3) months to ask to see a statement.

73.     BANA also has stated that an additional reason the GPA needed to be held at Merrill Lynch was due to concerns from the financial crisis and the solvency of the companies that held the monies.  This, however, is not a true statement, as the GPA monies, prior to BANA's requirement, were all held in trust accounts, directly held at the mutual fund companies.  It was,

however, BANA, a "Too Big to Fail" bank, who actually required federal taxpayer money through the Troubled Asset Relief Program in the amount of approximately $50 billion to save itself from insolvency, and it also was Merrill Lynch that was days away from insolvency itself had it not been saved with the purchase by BAC. The GPA monies during this time were perfectly safe, outside of the everyday mark-to-market risk due to fluctuations in bond prices, and were perfectly safe from insolvency as they were held in trust accounts.

74. BANA has stated further, the GPA needed to be held at Merrill Lynch because of concerns and risks that the account could be re-collateralized if not held by Merrill Lynch. This statement also is not true as Merrill Lynch has no extra protections in place different than its competitors, nor does BANA have any extra monitoring capabilities to prevent such activity from happening. BANA, moreover, can provide no example of this ever occurring on a loan where it had marketable securities pledged as collateral from another competitor. Attached as **Exhibit S** are three (3) collateral assignment agreements from three (3) different companies: First is the actual Merrill Lynch collateral agreement that was completed; second is a collateral agreement from UBS Financial; and third is a collateral agreement from Oppenheimer Funds. The language is nearly identical in all contracts, and shows no additional protection afforded from Merrill Lynch over and above its competitors.

75. BANA has stated as well in the past that it was legal to require the GPA to be held at Merrill Lynch due to its reliance on an August 18, 2003 Federal Reserve Board letter granting an exception to National City Bank. This exception letter did grant National City Bank the ability to require marketable securities to be held at its subsidiaries as a condition of a loan, however, BANA's statement is not a true statement since, in the National City exception, the Client, who had the requirement imposed upon it, had zero ability or authority to trade the securities in the

21

account, thereby the FED treated it as though the account was held akin to the bank holding it in a trust account.  In the case of the GPA, Maritz and InteliSpend had full authority to trade the account as they saw fit, without permission or approval from BANA in any matter, including acting as the Administrative Agent, and did so many times.  The circumstances are not even remotely similar to the National City exception granted by the FED, furthermore, these exceptions are granted only on a case-by-case basis by the FED, individually, and do not throw an umbrella of protection over similar acts of other banking institutions.  It is a fact that this exception did not apply to BANA.

76.     BANA has also stated in the past that a reason it was legal to require the GPA to be held at Merrill Lynch was due to a February 2, 2004 exception letter granted to Merrill Lynch Bank to allow marketable securities be held at their subsidiary MLPF&S for a Securities Based Loan. This is not a true statement by BANA either, as Security Based Loans are a product that requires at a minimum the **monitoring of the value and composition of the securities in the collateral accounts on at least a daily basis.**  Furthermore, Securities Based loans act akin to a brokerage margin account, where the loan amount available is predicated purely by the daily value of the securities held and fluctuate in direct correlation.  The two examples are not even remotely similar to the collateralization of the GPA monies.

77.     The only reason the GPA was required to be moved to BANA's affiliate, Merrill Lynch, by BANA, was due to corporate greed, as previously stated, the revenue generated to BAC by the management fees of the GPA were more than the revenues generated from the Loan itself. After BAC's acquisition of Merrill Lynch, BAC altered the compensation plan of its employees bonus structure to rely heavily upon the cross referral among all lines of business throughout BAC's subsidiaries and their affiliates.  The BANA employees who were involved in the GPA

requirement have admitted under oath that their requirement created a monetary compensation to them.  Attached, as **Exhibit T,** is a multitude of communications from the BANA bankers wanting referrals for the requirement of the GPA moving to Merrill Lynch over a period of approximately one (1) year from the date BANA imposed its requirement.

78.     The BANA employees involved in the illegal tie, including the individual acting as the administrative agent for the loan of the GPA assets, demanded from Bray that he enter the transaction into the BAC referral system, so they could be compensated for their requirement, when Bray was hired by Merrill Lynch.  Bray refused to do so as he believed their acts were illegal and mentioned this to them in an electronic communication.  From that point forward the BANA employees and Bray had a contentious relationship throughout Bray's eighteen (18) month tenure with Merrill Lynch.  Attached as **Exhibit U** are statements where BANA speaks internally as to its requirement of the GPA.

79.     The Federal Reserve Board, pre-financial crisis, issued a Proposed interpretation and supervisory guidance with request for public comment on August 25, 2003 in relationship to the Anti-Tying Restrictions of Section 106 of the Bank Holding Company Act Amendments of 1970[2].  To date the FED has never adopted or enacted any of these interpretations.  BANA, along with its bookrunning competitors have written the FED ad nauseam requesting that the FED provide them "safe harbor" as it relates to granting BANA immunity from the provisions of 12 U.S.C. § 1972 for syndicated loans, only to have the FED ignore all of its attempts to date.  This case is a prime example as to why the "Too Big Too Fail" banks want the "safe harbor" enacted,

---

[2] *See* Docket No. OP-1158 at
http://www.federalreserve.gov/boarddocs/press/bcreg/2003/20030825/attachment.pdf

as it is believed by the masses that this illegal activity by them occurs frequently.

80.     Two leading scholars of 12 U.S.C. § 1972 have reviewed and opined on this case and BANA's activities; Timothy Naegele, who co-authored the law itself, and has written extensively since regarding 12 U.S.C. § 1972, and Professor Cornelius Hurley, who served as Assistant General Counsel to the FED and is now the Director of the Boston University Center for Finance. Professor Hurley stated under oath that "this is the most egregious violation he has ever seen and the most explicit evidence ever provided as almost always the violations occur implicitly."

81.     Due to the money transmitter license laws being exposed, it was necessary for BANA to release the GPA from collateral. This release ultimately did not occur until on or around March 1, 2012. Attached, as **Exhibit V,** is an internal BANA communication regarding the release of the GPA monies. BANA has stated in the past that the reason the GPA was released from the collateral assignment to the Loan was because of Maritz's improved financial condition. This statement is of course not true as BANA was well aware the collateralization of these monies were against the law and the State of California would prevent InteliSpend from doing business in the State if this collateralization continued.

82.     Attached as **Exhibit W** is an example of the behind the scenes work done by BANA, some three (3) months after Bray resigned, to prevent Bray from ever managing the GPA account again. BANA employees, still upset by the fact Bray never referred the GPA to them so they could receive compensation, did everything in their power to "poison the well" with Maritz by making numerous slanderous remarks about Bray, which prevented Bray from having a relationship with his client again. This communication came some two-and-a-half months after the syndicate agreed to release the GPA from collateral, as represented in **Exhibit V**. BANA has

24

since admitted to making such false, slanderous statements about Bray, to Maritz, and BANA's own internal investigation proved that Bray did not make the statements that the BANA employee(s) stated to Maritz that he had.

## BRAY'S LEGAL STANDING TO BRING CLAIMS
## AGAINST THE DEFENDANT'S

83.    BANA's violations caused Bray a direct injury to his business and or property.  In fact Bray is now out of business precisely due to BANA's overall actions.  Not for BANA's actions Bray's eight year relationship with InteliSpend would have continued, a relationship that Bray was billing InteliSpend approximately $455,000 per annum for his services.

84.    Section 4 of the Clayton Act of 1914 allows the recovery of damages by "any person injured in his business or property by reason of anything forbidden in the antitrust laws.

85.    Bray was a competitor of BAC and its subsidiaries (including BANA) using the most strict definition of "competitor" and applying BAC's own verbiage in its defining of "competitor" in its 2009 10k Securities and Exchange filing.

86.    Regardless, however, due to the unanimous United States Supreme Court ruling in **Lexmark Int'l, Inc. v. Static Control Components, Inc., 134 S. Ct. 1377 (2014)** it is no longer necessary for Bray to prove he was a competitor to bring a suit.  On all statutory legislation the zone of interests using the "proximate cause" test must be applied unless the statutory language expressly negates it, and when deciding Bray's standing under the "any person", the statutory language of all the Acts before this Court, in this complaint, a Courts use of "prudential standing" must be eliminated.

87.    The Lexmark ruling is further cemented by **City of Miami v. Bank of America Corporation; Bank of America, N.A.; Countrywide Financial Corporation; Countrywide Home Loans; and Countrywide Bank, FSB,** the case of **Susan B. Anthony List v. Driehaus,**

and the case of **Commonwealth of KENTUCKY, Education and Workforce Development Cabinet, Office for the Blind v. UNITED STATES of America** in that the Lexmark precedence applies to all statutorily created causes of action unless in the statutory language of the law it expressly negates a party or parties whom may bring a claim.

88. When applying the required proximate cause test to Bray's claims it is evident that Bray has a valid claim and has a right to prove his case provided he meets the Article III constitutional standing.

89. Bray meets Article III by way of:

A. BANA violated the Acts upon which Bray has brought this complaint. This Court has evidence that prove such violations, of not only the law, but also BANA's own corporate policy.

B. Bray has shown this Court a causal connection between his injuries and the conduct of BANA's violation of the Acts. Bray has shown that "but for" the actions of BANA, he would not have been injured.

C. There is a "substantial likelihood" that the relief sought from a jury trial would remedy the financial harm caused to Bray from BANA for their acts.

90. Under § 1 Sherman Act Bray needs to show in order to sustain his cause of action that BANA made an agreement through its illegal contract, conspired with one another, produced adverse anticompetitive effects within the relevant products and geographic markets, the objects of and the conduct pursuant to the contract or conspiracy were illegal, and that Bray was injured as a proximate result of the conspiracy. Bray can easily prove the above.

91. Under § 2 Sherman Act Bray needs to show the Relevant Market, and the Dangerous Probability of Success to sustain his cause of action. Bray can easily prove the above.

92.    Under § 14 of the Clayton Act Bray needs to show that BANA engages in interstate commerce, sold a Loan and as a condition that the Maritz shall not use or deal in the goods of a competitor, and that the agreement was illegal and therefore lessened the competition substantially.  BANA's contract with Maritz contained restrictive clauses or covenants referred to in section, commonly called "tying clauses" that but for such "tying clauses" the competition in the particular commerce involved would have substantially lessened competition that tend to create a monopoly. Bray can easily prove the above.

## VIOLATIONS ALLEGED

### COUNT I
### Violations of Florida's Antitrust Law in Florida Statute Section 542.15 et seq.

93.    The allegations set forth in the preceding paragraphs 1-92 are incorporated herein by reference.

94.    Florida Statute Section 542.15 et seq. is specific as to what constitutes a violation:

**Unlawful Relationships with Competitors**

Arrangements between competitors are called horizontal arrangements under antitrust law. Some of these arrangements run afoul of antitrust laws. Generally, the agreements businesses enter into are unlawful only if they are for the intentional purpose of restraining trade or gaining a monopoly in the market. Some agreements are **per se illegal,** however. A per se illegal relationship with a competitor is one in which no anti-competitive intention must be proved. The arrangement itself, no matter what the purpose, is against the law.

**Tying**
Tying occurs generally when a company requires buyers to purchase one product or service (called the "tied" product or service) in order to obtain another product or service (the "tying" product or service), and the arrangement restrains trade. Illegal tying is a per se violation of the antitrust laws. Three elements must be present to constitute an illegal tie-in per se:

* A tying scheme must exist, in which buyers are required to buy one commodity or service in order to obtain another commodity or service
* The seller must have enough economic power in the tying product to allow it

.

to significantly restrict the market for the tied product.
* A fairly substantial amount of interstate commerce in the tied product must be
affected.

95.    While BANA's violations run afoul of Florida's antitrust laws in their horizontal

arrangements as the entire syndicate participated in the illegal activity BANA's illegal tie-in of

the GPA is also a clear per se violation.

96.    There is no way to determine the exact economic impact caused by BANA's violations of

the law to Florida or its citizens other than to say the economic impact was severe. It is a fact

that there was substantial economic impact to the state through its local communities. Bray,

NewBridge Securities, Oppenheimer Funds, and nine (9) other mutual fund companies Florida

resident wholesalers, no longer receive revenue from the GPA due to BANA's illegal actions.

97.    Bray's individual damages are easily identifiable, as of October, 28 2011, Bray was

billing InteliSpend approximately $455,000 per annum for his management services, of an

account with holdings of approximately $70,000,000. Most Registered Investment Advisors

such as Bray do not accumulate $70,000,000 in assets under management, cumulatively

throughout their entire career, whereas Bray accomplished this with one Client, that he

personally cultivated over a period of time of approximately eight (8) years, and grew the

account from $5,000,000 to $70,000,000.

98.    Bray is now out of business due to BANA's actions in their illegal activities and has lost

virtually every personal asset he accrued over his approximately twenty (20) year career as an

Investment Advisor. NewBridge Securities no longer has access to the 20% of Bray's revenue

for his management of his clientele. The mutual fund companies local representatives who

received compensation for Bray placing business with them is permanently impaired.

99.    Using macro economics and the "money in motion creates more money theory", millions

of dollars were taken from the State of Florida in revenue, over time, as these dollars will never be spent to generate revenue in Florida's economy due to BANA's violations.

100.  In the event the State of Florida chooses to intervene as *parens patriae* to satisfy the injuries incurred to all of its citizens due to BANA's violations referenced in **Count I** Bray will accommodate their request and become represented by Counsel as required.

Wherefore, in accordance of Florida Statute Section 542.22, judgment is demanded for damages against Defendant's in the amount of threefold the actual damages sustained for violations of Sections 542.18 and 542.19.

## COUNT II
### Violation of the Sherman Act 15 U.S.C. § 1

101.  The allegations set forth in the previous paragraphs 1-92 are incorporated herein by reference.

102.  Section 1 of the Sherman Act states that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."

103.  The Relevant Market for the purposes of this § 1 Sherman Act claim is the Syndicated Loan Market and BANA's ability to exclude competition, through its market power, of the Financial Services Market throughout the 50 states as set forth above, specifically herein the geographical market of Missouri and Florida.

104.  BANA states in its own literature that it is the leader in providing syndicated loans, and is the leader in bookrunning. Due to the requirements it imposed on Maritz and in its violation of 12 U.S.C. § 1972, and by imposing such requirements in the last hour of the loan approval process, BANA restricted Maritz's ability to go elsewhere to find another syndicated loan without the restrictions and requirements imposed by BANA.

105.   BANA engaged in a concerted activity as part of a conspiracy to prevent full and fair competition in the Relevant Market with not only its affiliate Merrill Lynch but with the five (5) other banking institutions involved in the syndicate, and used its market power to unreasonably restrain trade, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) when making the requirement of Maritz to move the GPA to their affiliate as a condition of the syndicated Loan.

106.   BANA's violation of 12 U.S.C. § 1972, combined with its dominant market power, the highly concentrated market structure, and its waiting to impose the loan requirements at the last minute, with the anticompetitive market effects and lack of potential justifications, are unreasonable restraints of trade.

107.   BANA exercised market power through the requirement and used this market power to control supply and exclude competition.

108.   By violating 12 U.S.C. § 1972 BANA placed restrictions upon Maritz through agreements combined in the form of trust or otherwise, or conspired in restraint of trade or commerce among the several States in violation of 15 U.S.C. § 1.

109.   None of BANA's anticompetitive practices explained throughout were reasonably necessary for BANA to protect the Loan.  Had BANA simply required, as originally proposed to Maritz, that the GPA be collateralized and allowed the monies to remain with Bray Independently their would have been no anticompetitive effect caused.

110.   Bray is suffering actual damages in the form of the complete destruction of his business, loss of goodwill, and the loss of his business reputation due to BANA's violations.

111.   In the event the Department of Justice Litigation II Section elects to intervene as to investigate BANA's actions beyond the identifiable instances involving **Count II** discussed herein Bray will accommodate their request and become represented by Counsel as required.

Wherefore judgment is demanded for damages against Defendant's in an amount not to exceed $100,000,000.

## COUNT III
### Violation of the Sherman Act 15 U.S.C. § 2

112.   The allegations set forth in the previous paragraphs 1-92 are incorporated herein by reference.

113.   By violating 12 U.S.C. § 1972, BANA monopolized, attempted to monopolize, or combined or conspired with other persons to monopolize or attempted to monopolize trade or commerce among the several States, or with foreign nations, in violation of 15 U.S.C. § 2.

114.   The Relevant Market for the purposes of this § 2 Sherman Act claim is Syndicated Loan Market and BANA's ability to exclude competition, through its market power, of the Financial Services Market throughout the 50 states as set forth above, specifically herein the geographical market of Missouri and Florida.

115.   BANA has a dangerous probability of success in monopolizing the relevant market due to their substantial market power and market share in the syndicated loan market.

116.   In the event the Department of Justice Litigation II Section elects to intervene as to investigate BANA's actions beyond the identifiable instances involving **Count III** discussed herein Bray will accommodate their request and become represented by Counsel as required.

Wherefore judgment is demanded for damages against Defendant's in an amount not to exceed $100,000,000.

## COUNT IV
### Violation of the Clayton Act 15 U.S.C. § 14

117.   The allegations set forth in the previous paragraphs 1-92 are incorporated herein by reference.

118.   By violating 12 U.S.C. § 1972 in connection with offering and perfecting a loan (sale of good and contract), BANA engaged in commerce, and in the course of such commerce, leased or made a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, for use, consumption, or resale within the United States, or fixed a price charged therefor, or discounted from, or rebated upon such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding was to substantially lessen competition or tend to create a monopoly in any line of commerce, in violation of 15 U.S.C. § 14.

119.   In the event the Department of Justice Litigation II Section elects to intervene as to investigate BANA's actions beyond the identifiable instances involving **Count IV** discussed herein Bray will accommodate their request and become represented by Counsel as required.

Wherefore judgment is demanded against Defendant's for the recovery of threefold the damages sustained by Bray.

## CONCLUSION

120.   There is no doubt that BANA through its violations of The Bank Holding Company Act § 1972, and by the requiring of Maritz to move the InteliSpend GPA monies, consisting of marketable securities (a non-traditional banking product/service), to its affiliate, Merrill Lynch, as a condition of the loan renewal, caused violations of the Sherman Act, Clayton Act, and Florida's Antitrust Law, pursuant to Section 542.15 et seq., of the Florida Statutes. By making the requirement, BANA engaged in an unusual banking practice, and by doing so excluded competition from the marketplace causing anticompetitive and antitrust violations.   BANA

32

clearly leveraged its market power and control over Maritz in the syndicated loan by altering terms of the loan at the last minute. Maritz had no choice but to accept BANA's illegal terms of the loan and thereby BANA consciously conspired and purposely eliminated interstate commerce from the tied product (GPA).

It is believed by many experts and scholars that this type of activity of banks committing anticompetitive and antitrust violations has and is occurring often by the "Too Big to Fail" banks such as BANA since the repeal of the Glass-Steagall Act, but due to the violations occurring most often implicitly it has been extremely hard to prove.

BANA received absolutely zero extra protection from its requirement to move the GPA and achieved zero extra monitoring capabilities. The only thing BANA accomplished by its violations was extra commissions and additional overall profit for BAC.

Dated: October 27, 2015

Patrick Ryan Bray (pro se)
4007 Riverview Blvd.
Bradenton, FL 34209
(941) 812-9007
pryanbray@msn.com

33